UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

MICHELE OKIN

                   Plaintiff,

- against -                                                        04 Civ. 3679 (CM)

VILLAGE OF CORNWALL-ON-HUDSON POLICE
DEPARTMENT, TOWN OF CORNWALL POLICE
DEPARTMENT, RUSTY O'DELL, THOMAS DOUGLAS
IV, MICHAEL LUG, PAUL WEBER, CHARLES
WILLIAMS, and EDWARD MANION all sued in their
individual capacities, and ROY SEARS,

                   Defendants.

-------------------------------------------------------------x

## DECISION AND ORDER GRANTING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

McMahon, J:

       Plaintiff Michele Okin brings this action against the Town of Cornwall and the Village of

Cornwall-on-Hudson and certain of their police officers alleging that defendants endangered her

by failing properly to respond, over a fifteen-month period, to her repeated complaints about

physical abuse and intimidation by her boyfriend, Roy Sears. Defendants responded to Okin at

least sixteen times over that period, but Sears was never arrested, and the alleged abuse

continued unabated. Okin alleges that defendants collectively and individually deprived her of

her Due Process and Equal Protection rights in violation of 42 U.S.C. § 1983. She seeks

compensatory and punitive damages, as well as injunctive relief.

The defendant police departments have moved for summary judgment under Federal Rule of Civil Procedure 56. In addition, the individual officers move for summary judgment on qualified immunity grounds.

For the reasons stated below, defendants' motions for summary judgment are granted.

## Facts

Both of plaintiff's constitutional claims rest on inferences she seeks to draw from the totality of her interactions with moving defendants. As such, a close scrutiny of the facts surrounding her numerous complaints and the defendants' response is appropriate.

Chronology of Events

Plaintiff, Michele Okin ("Okin") commenced a relationship with Roy Sears ("Sears") in the Spring of 1999. (Okin Dep. at 43.) In August 1999, Sears purchased a house at 11 Taft Place in the Village of Cornwall-on-Hudson and Okin moved in with him, although she continued to rent a separate residence in Cornwall until May 2001. (Id. at 44-45.) In May 2001, Okin gave birth to twins, Roy Charles Sears and Charliegh Roy Sears, who had been conceived through an in-vitro fertilization process with Sears. (Id. at 32.)

According to her Affidavit, Okin was repeatedly subjected to physical violence and intimidation from Sears between October 2001 and March 2003, ultimately resulting in more than 20 phone calls to the defendant police departments. (Pl. Aff. ¶2.)  The first incident of abuse Okin describes took place in October 2001, when Okin's hands were broken as she tried to defend herself from Sears' attack. She explains that although she told her primary care physician what had happened, she "begged her not to tell anyone or record this on her records" and lied to

others–including the psychiatrist she was seeing–about the cause of her injuries because she feared for her life and "felt Sears was beyond the law." (Id. ¶4.) She did not report this incident to the police. (Okin Dep. at 350-53.)

On December 23, 2001, Okin first contacted defendant Police Departments to report a domestic violence incident in which she states that Sears had thrown a bottle at her and was choking her. (Id. at 290-98.) According to her deposition, she placed three calls to the dispatcher before she was able to secure a police response. (Id. at 290-95.) Village of Cornwall-on-Hudson Police Officer Thomas Douglas IV ("Douglas") was then dispatched to 11 Taft Place. When he arrived at the scene, Douglas observed Sears changing an infant's diaper and another infant sitting in a seat on the floor. (Douglas Dep. at 55.) According to Douglas' notes in the Village of Cornwall-on-Hudson Police Incident Report he filed the following day, Okin stated "Can you please tell Roy to stop beating me. That is all I want." (Dec. 23, 2001 Police Department Incident Report at 2.) Although neither Okin nor Douglas could independently recall exactly what was said, Douglas described the plaintiff as "a little bit frantic." (Douglas Dep. at 33; Okin Dep. at 317-18.)

When shortly thereafter she removed her pants and began to show him bruises on her legs, Douglas called for a back-up officer. (Douglas Dep. at 33.) At her deposition, Okin could not recall exactly when she got the bruises, stating, "Roy was at that point hitting me every single day so it could have been that day or it could have been some other time, depending on when the bruises developed." (Okin Dep. at 318.) Douglas noted in the Police Department Incident Report, and confirmed at his deposition, that although he did observe bruises on Okin's legs, based on his experience as an EMT they "looked very old and in the process of healing."

(Dec. 23, 2001 Police Department Incident Report at 2.) He also noted that he had observed no redness or markings around Okin's neck. (Id.) At his deposition Douglas testified that, based on his observations at the scene, he had concluded that no offense had been committed. (Douglas Dep. at 56.) In his Domestic Incident Report, Douglas noted that there were "No problems at this residence." His supervisor Paul Weber ("Weber") signed off on the report. (Dec. 23, 2001 Domestic Incident Report at 1.)

Town Officer Edward Manion ("Manion") was dispatched to the scene in response to Douglas' call for back-up. Okin again showed Manion the bruises on her legs, and Manion testified at his deposition that based exclusively on his personal experience with bruises, he concluded that they appeared old. (Manion Dep. at 45.) Manion likewise testified that Sears had denied inflicting the bruises. However, he said that the only reason he did not arrest Sears was because he judged that the bruises were too old and believed that mandatory arrest was warranted only in the event of immediate injury. (Id. at 40, 45.) There was no discussion between Manion and Douglas about the age of the bruises or the possibility of arresting Sears. (Id. at 46.) Manion further testified that he prepared no independent report of the incident because the incident occurred in the Village, and so was Douglas' case rather than his. (Id. at 34.)

The plaintiff's and defendants' accounts differ significantly on the issue of Okin's desire to press charges. Douglas testified in his deposition that both he and Manion repeatedly advised her of the procedures she would need to follow in order to press charges against Sears, but that she changed her mind and decided that she did not want to press charges, at one point walking away from Manion while he was explaining to her what she would need to do. Ultimately,

4

plaintiff signed the Domestic Incident Report, which stated that she "refused to sign charges."

Douglas (Dep. at 49, 50.)

In contrast, Okin testified that she did not recall having any of the arrest procedures

explained to her and that as soon as Sears had left the room and she felt safe, she told the police

officers that she wanted to press charges. (Okin Dep. at 331, 340.) She explained that she walked

away from Manion because he was being unresponsive, and that Douglas' response to her when

she told him she wanted to press charges was "very derogatory." (Id. at 331, 341.) In fact, she

testified that both police officers were discussing sports with Sears at various points throughout

the incident, rather than expressing concern for her safety or that of her children. (Id. at 326,

341.)

As to the Domestic Incident Report, in her response to Town Defendants' 56.1 statement

Okin denied signing the document in a form that indicated she did not want to press charges.

However, her deposition testimony on this point is muddled, and the final version of the Report

bears her signature. (Pl. 56.1; Okin Dep. at 340.) Okin further testified at her deposition that the

day following the incident she went to the police station to press charges against Sears. (Okin

Dep. at 340.)

The next domestic violence incident to which Okin testified at her deposition occurred on

January 1, 2002, when she contacted the police department because "Roy was roughing [her]

up." (Id. at 375.) Weber took no further action that day. (Id.)

During the period between January 2002 and April 2002, Okin frequently contacted

Sears at the Days Inn in New Windsor by phone, fax, and in person. The Days Inn interposed

several complaints with the New Windsor Police Department against Okin. (New Windsor

5

Police Department's Complaint Reports dated January 15, 2002, February 8, 2002, February 21, 2002, and April 21, 2002.) Okin was charged with trespassing for her conduct at the Days Inn and pled guilty, receiving an adjournment in contemplation of dismissal. (Okin Dep. at 574-75.)

On February 8, 2002, Village Officer John Pena ("Pena") responded to Okin's residence and spoke to Sears, who stated that Okin had removed $105,000.00 from his personal checking account without his consent, and that he had come to the house to find the rest of his check books. (February 8, 2002 Village of Cornwall-on-Hudson Police Department Incident Report at 1.) Chief Charles Williams ("Williams") and Officer Jill Nye ("Nye") arrived on the scene to assist. Williams then asked Sears to accompany him to police headquarters to investigate his allegation that Okin had stolen money from him. (February 10, 2002 Village of Cornwall-on-Hudson Police Department Incident Report at 1.) At his deposition, Williams testified that he spoke to Sears for under an hour, during which time Sears produced no evidence that Okin had stolen funds from him. (Williams Dep. at 20-30.) Williams apparently advised Sears "to stay clear of the residence." (February 10, 2002 Village of Cornwall-on-Hudson Police Department Incident Report at 1.)

In the meantime, Nye and Pena entered the residence to speak with Okin, who "verbalized her discomfort in having a male officer speak with her." (Id.) According to Nye's report, "She appeared to be distraught and confused," and " . . . repeatedly brought up prior incidents related to domestic violence." Nye further noted that "Okin made several attempts to show signs of abuse" but she "did not observe any markings on her person." (Id.) Okin stated that she had permission to take Sears' money but that she had put it into a temporary account for

the children. (Id.) Although Nye's notes from the report indicate that the investigation was to be continued, the status of the case was "closed" as of February 8, 2002. (Id.)

On March 8, 2002, Weber responded to Okin's residence after the police received a 911 call reporting an assault stabbing. According to the dispatcher's notes, the caller had stated that " . . . her boyfriend pushed her around tonight and she is scared that he is going to come to the house and hurt her." (March 8, 2002 Village of Cornwall-on-Hudson Police Department Incident Report at 1.)

From here, the stories diverge significantly. In his Incident Report, Weber indicated that, when he arrived at the location, there was no answer at the door or the window and that Okin only answered the door after receiving a return call from the dispatcher. At her deposition, Okin denied receiving such a call. (Id.)

Weber further observed that Okin "did not seem to be shaken or upset," although she told him that she was assaulted and stabbed in the feet by Sears at the Days Inn in New Windsor. (Id.; Weber Dep. at 57.) Weber testified that when he observed that there were no injuries to her feet, Okin said, "Oh, I heal quickly." (Weber Dep. at 57.) In the Incident Report– which Weber categorized as a General Incident rather than a Domestic Violence Incident–Weber indicated first, "It was learned that no assault had occurred and no stabbing had occurred," and next, "Ms. Okin stated that she was assaulted by Roy Sears at the Days Inn in New Windsor at Approx. 2030hrs." (March 8, 2002 Village of Cornwall-on-Hudson Police Department Incident Report at 1.) At his deposition, Weber explained that the reason for the apparent discrepancy was the fact that no assault or stabbing had occurred in his jurisdiction. (Weber Dep. at 56.)

In concluding the incident report, Weber wrote "As she was ranting about the police

'refusing' to help her (even though she is an attorney and should understand jurisdiction more than anybody), she began complaining about 'Officer Weber' and that he blatantly refused to entertain her complaint on one of the previous occasions that she called and the police responded to her house." Weber explained that he had never been to Okin's residence before, and concluded, "She is obviously confused. It should also be noted that the interior of the house appears to be in disorder. It is unknown if she is able to maintain the residence." (March 8, 2002 Village of Cornwall-on-Hudson Police Department Incident Report at 1.)

At her deposition, Okin stated that she did not remember telling the dispatcher that Sears had stabbed her or receiving a call from the dispatcher.  (Okin Dep. at 380, 387.) She testified that Weber had failed to arrest Sears on New Year's Day, that she complained of this to Weber, and that he repeatedly refused to arrest Sears on this occasion. (Id. at 382, 385.)

On the whole, Okin's recollection of the events surrounding the March 8th incident was quite hazy and, at times, contradictory. (Id. at 379.)  Whereas in her affidavit Okin stated that she had shown Weber her feet that evening, and that they bore evidence of a stab wound, plaintiff denied showing Weber her feet or claiming that she had been stabbed in her Response to Town Defendants' Rule 56.1 Statement. (Okin Aff. ¶7, Pl. 56.1 ¶50.) Okin denied that Weber advised her to follow up with the New Windsor or State police and stated in her affidavit that she did not do so because the event had occurred at her residence at 11 Taft. But she admitted that she had told Weber at the time that the assault occurred in New Windsor. (Okin Aff. ¶8; Pl. 56.1 ¶52.)

According to her deposition, on March 25, 2002, Sears threatened to kill Okin over the phone. (Okin Dep. at 392.) Although she did not recall a phone conversation with the police on that occasion, according to the Police Department Incident Report, at 12:45 A.M. on March 25,

2002, Officer Arthur Terwilliger ("Terwilliger") responded by phone, " . . . because a subject at 11 Taft wanted to speak to an officer." (First March 25, 2002 Village of Cornwall-on-Hudson Police Department Incident Report at 2.) Terwilliger's Report, which classified the incident as one of "harassment" rather than domestic violence,  notes that Okin stated that Sears was staying at the Days Inn in New Windsor. His notes further indicate that Okin complained that the police department "does nothing to Roy when he does something wrong" but that when she was asked to sign a complaint against Sears, she replied "No, that is going to make the situation worse." (Id.) Terwilliger then told Okin he would patrol her area often that evening and instructed her to call dispatch if Sears returned.

At her deposition, Okin did not recall being asked whether she would like to sign a complaint, but contends that Terwilliger violated department policy by simply closing the case in the face of threats against her life. At his deposition, Terwilliger indicated that he had no specific training in how to handle a situation where the recipient of a threat experiences fear that filing a complaint will make matters worse. (Terwilliger Dep. at 17-18.) Weber signed off on the Report in a supervisory capacity, but Terwilliger did not recall speaking to a supervisor about the incident. (Id.)

On the same day, Okin reported to the police that she had received a threatening note at her place of business, which said "M.O., sleep with one open at night." (Second March 25, 2002 Village of Cornwall-on-Hudson Police Department Incident Report at 2.) The Report that was generated classified the incident as "harassment" but did not identify a suspect. Although, Okin did not see Sears write the note or drop it in her box, she stated that she recognized his handwriting and testified that he admitted he had left the note for her. (Cplt. ¶22; Okin Dep. at

394-95.) In her complaint, Okin alleged that when she expressed her alarm to Weber, he responded that the initials M.O. could stand for "Monster Organization" rather than Michele Okin. (Cplt. ¶22.) Plaintiff points to no evidence in the record (including any testimony of her own) that supports this allegation.

Later that evening, Okin called the police to report that she received a death threat the previous day, as well as a threatening letter earlier that day and was now hearing suspicious noises outside her residence. (Third March 25, 2002 Village of Cornwall-on-Hudson Police Department Incident Report at 1.) Although Okin indicated that she did not want Weber to be dispatched, Weber responded and noted that he checked the exterior of the residence and observed no problems. (Id.)

The Report further notes that Okin complained to Weber " . . . that the police never do anything when she calls" and that he advised her of the procedure she would need to follow to pursue charges, but she refused. (Id.) Weber noted in the Report "She [Okin] continued to complain about Roy Sears and I advised that if he is so violent toward her, it would obviously be in her best interest to stay away from him." (Id.) While Okin denied that Weber or any other officer advised her of her right to file a civilian complaint in her Response to Village Defendants' Rule 56.1 Statement, there is no testimony or other evidence in the record supporting her claim. At her deposition, Okin further testified that although she was unsure of the date, she believed that around the same occasion she heard Sears throwing stones at the house.

On April 12, 2002, Village Police Officer Charles Hoffman ("Hoffman"), as well as a state trooper, responded to a 911 call from Okin's residence. (April 12, 2002 Village of

10

Cornwall-on-Hudson Police Department Incident Report at 1.) Okin was very distraught. She stated that she had heard noises outside and knew that it was Sears though she never saw him on the property. (Id.; Okin Dep. at 497.) Hoffman requested a town unit, and Sergeant Michael Carroll ("Carroll") responded. (Id.) Okin testified that she did not recall Carroll responding that night. (Id.) Hoffman checked the area surrounding the residence several times that night and observed no one after which the incident was closed. (Id.) Williams signed off on the report. (Id.)

On May 12, 2002, Okin and Sears had an argument at the Days Inn, after which they drove back to 11 Taft Place in separate vehicles. (Okin Dep. at 415, 419-420.) Okin testified that, after they arrived, Sears kicked her in the leg, which she had previously broken, and proceeded to turn off the power to the house. (Id. at 421-423.) Barbara Corwin ("Corwin"), a next door neighbor, observed the argument through an open garage door. She testified that she called the police when she observed Sears "in a threatening position," though at no point did she see them physically fighting. (Corwin Dep. at 7, 10, 78.)

Village Police Officer Michael Lug ("Lug") responded to the call. According to his report, in which Lug characterized the incident as "disturbance-neighborhood trouble," Okin first said that she was screaming because she fell and was in pain. (May 12, 2002 Village of Cornwall-on-Hudson Police Incident Report at 1.) There were no lights on in the residence. (Id.) Lug observed that the master break in the circuit break box was turned off, then turned it back on and made sure that the phones were working. Okin then told Lug that Sears had turned off the power, that he had kicked her in her broken leg, punched her, and slapped her. (Id.; Okin Dep. at 424-25.) Lug further noted that Okin stated that Sears took $1550 of her money from the kitchen cabinet.

11

Lug advised Okin that he was going to complete a report. He claims she refused to sign it. (May 12, 2002 Village of Cornwall-on-Hudson Police Department Incident Report at 1; Okin Dep. at 426.) Okin testified that she never refused to sign the report, but could not recall whether she asked Lug to arrest Sears on that particular occasion. (Okin Dep. at 426.) Lug's handwritten notes from the incident indicate that Okin did ask him to arrest Sears and that Okin told him that Sears had mocked her by saying, "Are you going to [the] police, bitch?" (Lug Dep. at 65.)

At his deposition, Lug testified that he did not respond to a complaint about domestic violence–his notes to the contrary notwithstanding–but rather one about "turning off the power." He could not explain why his report fails to note that Okin wanted Sears arrested. (Lug Dep. at 66, 76-77.)  Lug's report does not name Sears as a suspect or indicate that there were any suspects or victims. (May 12, 2002 Village of Cornwall-on-Hudson Police Department Incident Report at 1.) Lug testified that he could not recall why he never changed those numbers from "0" to "1" even though there had been one suspect and one victim, or why his report never fully identified Sears. (Lug Dep. at 68.) He testified that he never intended to question Sears or to arrest him in connection with any police matter; nor did he ever do so. (Id. at 60.) Nor could Lug recall why he never interviewed Barbara Corwin. (Id at 71.) No domestic incident report was prepared.

The following day, May 13, 2002, Okin called the Village police department and reported that Sears had pinched her on the back and "raised his hand to her," while the two were at the office of Alan Kaslanski, Sears' attorney. (May 13, 2002 Village of Cornwall-on-Hudson Police Department Incident Report at 1.) According to the police report of the incident, characterized as "disturbance-disorderly conduct," Nye checked Okin's back, did not see any

12

marks resembling bruising or injury, and asked Okin whether she needed medical attention, which Okin declined. Id. Nye advised Okin that she needed to speak with the Town police regarding the incident because it had occurred in their jurisdiction, and closed the case. (Id.)

On May 19, 2002, Weber responded to Okin's residence to speak with her about an incident that occurred the previous day. According to the Village police report, which classified the incident as "harassment," Okin stated that Sears had threatened to shoot her and to report her to Child Protective Services. (May 19, 2002 Village of Cornwall-on-Hudson Police Department Incident Report at 1.) Weber noted in the report that this last threat "actually upset Okin" and that she did not want to pursue the "shooting" threat–claims that Okin vehemently denies in her affidavit. (Id.; Okin Aff. ¶10.)

Weber further noted, "It is unknown why she didn't call the police when the incident occurred but instead elected to wait until the next day to report it." (May 19, 2002 Village of Cornwall-on-Hudson Police Department Incident Report at 1.) When Okin "started going off on tangents about subjects like Sears leaving the garage door open and her broken hands," Weber advised her that "those aren't issues that the police can handle." (Id.) The report once again lists no victims or suspects, and Sears was not interviewed in connection with the threat. (Id.) Weber closed the case, and no domestic incident report was prepared.

On June 3, 2002, Okin called the police, indicating that she wanted to have a report taken that various items in the house "had been breaking" since May of 2002, that Sears had thrown rocks at 11 Taft Place, and that items such as her jewelry had been stolen and later found in Sears' car. (June 3, 2002 Village of Cornwall-on-Hudson Police Department Incident Report at 1.) Pena was dispatched to Okin's residence, and Town Officers Tausk and Ogden were

dispatched in a back-up capacity. Tausk testified that he "just pretty much stood in the background while the Village officer handled the complaint." (Tausk Dep. at 7.) Okin could not specifically recall speaking to either Tausk or Ogden. (Okin Dep. at 647.) Pena closed the complaint the same day with no further investigation, and Weber signed off on the report. (June 3, 2002 Village of Cornwall-on-Hudson Police Department Incident Report at 1.) A domestic incident report was never filed.

At her deposition, Okin testified that, between June 3, 2002 and November 15, 2002, there were other incidents of physical abuse and assault, but she did not contact the police because she "knew they weren't going to do anything." (Okin Dep. at 549.) It appears, however, that Okin did contact the police on November 2, 2002, to file a complaint regarding a broken door lock at 11 Taft Place. (Id. at 547.)  Terwilliger testified that he was dispatched in response to the call with Tausk in a back-up capacity. (Terwilliger Dep. at 34-35.) Terwilliger interviewed Okin who stated that when she arrived home on October 31, 2002, the front door was slightly open and the lock did not work properly. (Okin Dep. at 547-48.) She stated that a friend had fixed the lock on November 2, 2002. (Id.) Terwilliger looked at the door and reported that it did not appear that anyone had attempted to gain entry from outside. (Terwilliger Dep. at 37.) When Terwilliger asked Okin whether anything was missing from the house, she told him she did not have time to look. (Okin Dep. at 547-48.) Terwilliger then advised her that if she found anything missing to contact the police, and in the future to contact the police as soon as an incident occurred. (November 2, 2002 Village of Cornwall-on-Hudson Police Department Incident Report at 1.)

On November 15, 2002, Okin went to the Town Clerk's office to obtain an order of

14

protection against Sears. (Okin Dep. at 628.) She testified that she and Town Police Chief Rusty O'Dell ("O'Dell") engaged in a conversation about obtaining an order of protection, during which she "explained to him what the village police weren't doing and were doing and Mr. O'Dell promised [her] that it would never happen on his watch . . ." (Id.) After this conversation, Okin filed a family offense petition seeking an order of protection with the Orange County Family Court. (Id. at 632.)

The date that the order went into effect is disputed. Okin insists in her Response to Town Defendants' Rule 56.1 Statement that the order went into effect on November 15, 2002 and was merely extended on February 14, 2003. She cited in support a police report that was executed on January 21, 2003, in which the order of protection is referenced by docket number. Moving defendants assert that a Temporary Order of Protection was entered for the first time on February 14, 2003 and point to the document itself in support of their proposition. (Family Court Temporary Order of Protection, dated February 14, 2003.) Thus it is disputed whether there was an order of protection in place during the incidents alleged between November 15, 2002 and February 14, 2003.

On November 15, 2002, Village Officer Christopher Park ("Park") received a phone call from Okin, who stated that she was concerned that Sears "was coming over and kicking her out of the house." (First November 15, 2002 Village of Cornwall-on-Hudson Police Department Incident Report at 1.) Park advised Okin to take care of the matter in civil court, and she stated she was going to get an order of protection against Sears. (Id.) Minutes later, Park received a cell phone call from Sears, who stated that he was attempting to have Okin removed from his house. Park advised Sears that this was a civil matter to be dealt with in civil court. (Second November

15

15, 2002 Village of Cornwall-on-Hudson Police Department Incident Report at 1.)

On November 18, 2002, Sears came to the village police station to report that he had ongoing problems with Okin and wanted to remove her from 11 Taft Place. Park again advised him to pursue the matter through civil means. (November 18, 2002 Village of Cornwall-on-Hudson Police Department Incident Report at 1.)

On January 16, 2003, Weber responded to Okin's residence to a report of a missing vehicle. (January 16, 2003 Village of Cornwall-on-Hudson Police Department Incident Report.) An altercation ensued between Weber and Pat Coviello ("Coviello"), Okin's boyfriend. Weber advised Coviello and Okin to call the state police (who ultimately handled the complaint) and left. Id.

On January 20, 2003, Terwilliger responded to Okin's office because Okin's employee, Rhonda Fall ("Fall"), claimed she might have seen Sears parked in his vehicle outside the office in violation of an order of protection. (January 20, 2003 Village of Cornwall-on-Hudson Police Department Incident Report.) Okin was not in the office and did not see Sears or the vehicle, but Fall stated that she recognized Sears from a photo Okin had shown her. (Id.) Okin was advised that the department would "bring this information before the judge to see if we have enough to pursue the matter." (Id.)

The following day, Weber noted that, according to the state police, there was not enough to pursue the matter. (January 21, 2003 Village of Cornwall-on-Hudson Police Department Incident Report.) According to his report, Okin called the Village Police Department again, and Terwilliger was dispatched to the home. She also called the sheriff's department. Weber went on to note "It appears that Ms. Okin is engaging in a sort of forum shopping wherein she calls

16

agency after agency until she finds one that will pursue her complaints (usually against Mr.

Sears), even though she [is] told time and again that there is not enough to go on. It is unknown

at this time what motive she has for claiming Mr. Sears as the 'suspect' in every negative event

(both reported and unreported) that occurs in her life."(Id.) Weber concluded that, based on

Fall's ambiguous identification of Sears on this particular occasion, there was no probable cause

to arrest him. (Id.)

On March 13, 2003, Okin appeared in Cornwall Town Court with respect to a complaint

filed by Sears to remove Okin from 11 Taft Place. Okin testified that while on the witness stand,

Sears stood up, pointed his finger in her face and said, "I'm going to get you outside." (Okin

Dep. at 652.) He then threatened Okin's attorney, Neal Frishberg ("Frishberg"). (Id.) At his

deposition, Frishberg testified that Sears had threatened him in Court and that Judge Thompson

was unresponsive. (Frishberg Dep. at 28-29, 35.) After the proceeding, Okin, Frishberg, and

Coviello went to a diner for about 15-20 minutes to discuss what steps to take in response to

Sears' conduct. (Id. at 657.)  Afterward, Okin and Coviello went back to 11 Taft Place and called

the police to report Sears's threats. It is disputed whether they called the Village Police

Department or a general dispatch for both agencies. (Id at 657-660.) When Okin made contact

with the Village Police Department, she was advised that the complaint was not within their

jurisdiction. (Id. at 661.) As Okin perceived the situation, "It was futile talking to them. It was a

dead end." (Id. at 660).

Okin and Coviello then went to the Town Police Department where Okin advised Manion

that she was in fear for her life. (Id at 662.) She informed him that Sears had threatened her in

front of presiding Town Justice, Judge Joseph L. Thompson. (Id. at 652.) Okin showed Manion

her order of protection, but according to her testimony, he refused to accept it or to arrest Sears. (Id. at 664.)

Manion testified that he informed Okin that he could not guarantee that Sears would be arrested that evening because some investigation would need to be done and advised her to go to the state police. (Manion Dep. at 64.) Okin denies that she was ever so advised. (Okin Dep. at 671.) The following day on March 14, 2003, Okin called O'Dell to discuss the incident. He told her that he would speak with witnesses regarding what had transpired. (Id. at 671-73.) On that same day, O'Dell spoke with Lynn Tucci ("Tucci"), Clerk of the Town of Cornwall Justice Court, who advised him that, while Okin and Sears had gotten loud in court, she did not recall any specific harassment or threats. (O'Dell Dep. at 44.) O'Dell testified that he left three messages for Coviello (since deceased) on March 14, 2003, in an attempt to follow up with him about the incident, but that the latter never returned his calls. (O'Dell Dep. at 49.) Okin has produced no admissible evidence to the contrary.

When O'Dell next spoke with Okin, he recounted his conversation with Tucci and told Okin that he was not going to arrest Sears. O'Dell did not follow up with Judge Thompson until at least a month later, when he was in court on another matter. The judge recalled nothing about the incident. (Id. at 47.)

Defendants' Relationship with Sears

In her complaint, Okin alleged, "The defendants failed to act against Sears because he had significant personal relationships with ranking members of their respective police departments and made financial contributions to or at the behest of the Town Police Department." (Cplt. ¶22.) The evidence Okin has produced in support of these allegations is at

18

best scant.

*Town Defendant Officers*

Despite Okin's claim of a connection between high-ranking members of the Town Police Department and Sears, there is no evidence that O'Dell has ever met Sears. O'Dell testified that he would not know Sears if he saw him in the street, never spoke with Sears on the phone, does not know what Sears does for a living, and is not aware if Sears has made any contributions to the Town Police Department. (O'Dell Dep. at 31.) He acknowledged that he knew that Sears co-owned the Leprechaun Inn, because a friend of his, Robert King ("King") is also a part-owner in the business. There is no evidence that they ever discussed Sears.

For his part, Manion frequented the Leprechaun Inn between 1990 and 2002 and was aware that Sears co-owned it. (Manion Dep. at 16.) Manion first met Sears in 1999 at the restaurant, and on one occasion shortly thereafter Sears, introduced him to Okin. (Id.) He also ran into Sears while helping King move into a new business in Cornwall. Manion was not, however, aware of Sears' involvement in Scenic Technologies, a local business in the Village of Cornwall-on-Hudson or of his sponsoring any events in the community. Manion never approached Sears and asked him for donations for the Police Benevolent Association, does not know whether Sears has ever made any such donations, and never received free food or drinks at the Leprechaun Inn. (Id. at 87-94.) There is no record evidence to the contrary.

Officers Tausk and Town Police Sergeant Steven Dixon know nothing about Sears and have had no contact with him whatsoever. (Tausk Dep. at 7; Dixon Dep. at 10.) Again, the evidence on this point is undisputed.

*Village Defendant Officers*

19

Williams became Chief of the Village Police Department in 2001. (Williams Dep. at 6-7.) He first met Sears sometime later, when Sears sought permission from the Mayor to drop the ball at the Village Square on New Year's Eve. (Williams Dep. at 25.) In her affidavit, Okin alleged that the two men had one additional conversation, which Sears purportedly discussed with Okin. The only other contact Williams had with Sears prior to this litigation occurred during the February 8, 2002 incident described above.

Williams was aware that, sometime before he became Chief, the company Sears was involved with had donated some aluminum to help the Village manufacture a cage for the Department's first canine vehicle and allowed the canine school to utilize a building of his to practice building searches. He never personally solicited Sears for any gifts to the Village Police Department. (Id. at 34-6.)

Okin produced no evidence of any relationship between Sears and Douglas.

Lug testified that he had heard that Sears was involved in a manufacturing business in the Village and was part owner of the Leprechaun Inn. He stated that Sears was once pointed out to him at a local bar in the late 1990's, but that he had no conversation with Sears on that occasion. (Lug Dep. at 56-57.) Lug also recalled seeing Sears once in a vestibule in the Police Department in 2000. (Id at 57-58.) Aside from those two incidents, Lug had no recollection of ever being in Sears' presence, speaking to Sears on the phone, or looking for Sears as part of his police duties. (Id. at 59-60.)

When asked about Roy Sears at his deposition, Weber responded that he "knew of him" and had contact with him concerning a traffic incident. (Weber Dep. at 60.)

Domestic Violence Policies and Training

20

Both the Town of Cornwall and Village of Cornwall-on-Hudson have a domestic

violence policy, which requires the police departments to respond to every report of a domestic

incident and "to consider domestic violence as criminal conduct that shall be investigated as

would any other offense." (Town of Cornwall Police Department Manual, General Order # 3.22,

Domestic Violence revised June 7, 2001 at 1; Village of Cornwall-on-Hudson Police Department

Domestic Violence Policy dated May 1, 2001 at 1.) At their respective depositions, defendant

officers all testified to receiving some form of domestic violence training–in some cases on

multiple occasions–but their recollection of specific domestic violence laws, policies, and

procedures was highly inconsistent.

**Discussion**

Standard of Review

Under Federal Rule of Civil Procedure 56(c), a court will grant summary judgment if the

evidence offered shows that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 106

S. Ct. 2548 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505

(1986). Granting of summary judgment is appropriate "where the nonmovant's evidence is

merely colorable, conclusory, speculative, or not significantly probative." Travelers Ins. Co. v.

Broadway W. Street Assoc's., 164 F.R.D. 154, 160 (S.D.N.Y. 1995) (citing Anderson, 477 U.S.

at 248, 106 S. Ct. at 2510). Before a district court grants summary judgment, "the record must

clearly establish both 'the losing party's inability to enhance the evidence supporting its position

and the winning party's entitlement to judgment.'" Pangburn v. Culbertson, 200 F.3d 65, 69 (2d

Cir. 1999) (citing Ramsey v. Coughlin, 94 F.3d 71, 74 (2d Cir. 1996)). Summary judgment is

improper if there is any evidence in the record that would allow a reasonable fact-finder to find

21

in favor of the non-moving party.  On a motion for summary judgment, the court views the

record in the light most favorable to the non-moving party and resolves all ambiguities and

draws all reasonable inferences against the moving party.  See United States v. Diebold, Inc.,

369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962); Donahue v. Windsor Locks Bd. of Fire Commn'rs,

834 F.2d 54, 57 (2d Cir. 1987).

Defendants' Motion for Summary Judgment

      Although moving defendants have not raised the issue, it is axiomatic that political

subdivisions of a municipality, such as police departments, cannot be sued in their own right. See

e.g., La Rouche v. New York, 369 F. Supp. 565, 567 (S.D.N.Y. 1974). The complaint is

therefore dismissed *sua sponte* with respect to the "Village of Cornwall-on-Hudson Police

Department" and the "Town of Cornwall Police Department." The Village of Cornwall-on-

Hudson and the Town of Cornwall are hereby substituted as the proper parties to the suit.

*1. The Motion for Summary Judgment on the 42 U.S.C. § 1983 Claim for Violation of the Right to Due Process Under the Fourteenth Amendment is Granted as to All Moving Defendants.*

      As should be obvious from the foregoing, the relevant facts in this case are, for the most

part, hotly disputed. Ordinarily, this is not the sort of case in which summary judgment is

appropriate.

      Moreover, the court cannot help but observe that, even if I were to view the officers'

version of events as true (which I cannot, for purposes of this motion), their conduct in the face

of Okin's complaints ranges from insensitive to incomprehensible, and evidences either a lack of

training or a lack of comprehension about the realities of domestic violence.

      However, given the state of the law concerning the obligations of the police to protect

persons against assault by private actors, it is necessary to analyze plaintiff's claims rigorously against the existing precedents, rather than simply to order the parties to trial because of the state of the record.

The plaintiff claims that defendant police officers deprived her of her Due Process rights in violation of 42 U.S.C. § 1983 through acts and omissions that emboldened her abuser and made her more vulnerable to his attacks. The moving defendants respond that mere police inaction in the face of a private threat does not constitute a violation of Due Process.

Section 1983 does not create substantive rights, but provides a mechanism to recover for the deprivation of a federal right. The elements of a § 1983 claim are as follows: (1) that the conduct in question deprived a person of a right, privilege, or immunity secured by the Constitution or the laws of the United States, and (2) that the acts were attributable at least in part to a person acting under color of state law.  See Dwares v. New York, 985 F.2d 94, 98 (2d Cir. 1993); Brown-Alleyne v. White, 96 CV 2507, 1999 U.S. Dist. LEXIS 18511 (E.D.N.Y. Oct. 11, 1999). The defendants do not contest that the action (or inaction) under attack in this case was perpetrated  under color of state law.

The starting point in analyzing plaintiff's Due Process claim is DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 197, 109 S. Ct. 998 (1989), in which the Supreme Court held, "A State's failure to protect an individual against private violence simply does not constitute violation of the Due Process Clause." The Supreme Court discussed the "undeniably tragic" facts of DeShaney at length, and they deserve some elaboration here. Id. at 191.

The authorities first learned that Joshua DeShaney might be a victim of child abuse in January 1982, when his father's second wife complained to the police that Joshua's father had

previously "hit the boy causing marks and [was] a prime case for child abuse." Id. at 192. The

Winnebago County Department of Social Services (DSS) interviewed the father, Randy

DeShaney, but he denied the accusations, and DSS did not pursue them. A year later the boy was

hospitalized with multiple bruises and abrasions. The DSS obtained an order from a juvenile

court, which placed Joshua in the temporary custody of the hospital. Id.

On the recommendation of a "child protection team," consisting of a pediatrician, a

psychologist, a police detective, the county's lawyer, several DSS caseworkers, and various

hospital personnel, the juvenile court dismissed the case and returned the boy to the custody of

his father, who promised to cooperate with the DSS. During 1983, the boy was hospitalized

twice for suspicious injuries. The DSS caseworker who made monthly visits to the boy's home

recorded in her files her continuing suspicions of child abuse, but the DSS took no action. After

the last of Joshua's visits to the emergency room, his caseworker was told that Joshua was too ill

to see her on two separate occasions. Still the DSS did not respond. Id. at 192.

In March 1984, Randy DeShaney beat 4-year-old Joshua so severely that he fell into a

life-threatening coma. Id. at 193. Joshua and his mother brought an action under 42 U.S.C.

§1983 alleging that Winnebago County, the DSS, and various individual employees of DSS had

deprived Joshua of Due Process by failing to intervene to protect him against a risk of violence

at his father's hands, of which they knew or should have known.

Although faced with the state authorities' repeated failure to intervene in an egregious

ongoing case of child abuse, the Supreme Court nonetheless held that no constitutional violation

had occurred because the State had no affirmative duty to protect Joshua. The core purpose of

the Due Process Clause, the Court explained was "to protect the people from the State, not to

24

ensure that the State protected them from each other." <u>Id.</u> at 195-6. The Court concluded with a cautious reminder that the harm was inflicted by Joshua's father and not the State of Wisconsin. <u>Id.</u> at 203. "The most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." <u>Id.</u>

Although <u>DeShaney</u> dealt with a case of child abuse rather than domestic violence, its underlying facts bear a notable resemblance to the present case. In <u>DeShaney</u>, as here, the Court confronted repeated reports of physical violence that were either ignored by the state authorities or received an inadequate response. In <u>DeShaney</u>, as here, the plaintiff urged that the State be held to account for the private harm that he had suffered. Yet in <u>DeShaney</u>, the Supreme Court emphatically rejected this line of argument. If Okin can show no more than that defendants "stood by and did nothing," she cannot establish a Due Process violation.

However, this Circuit has long recognized an exception to the <u>DeShaney</u> rule, whereby state actors can be held liable under §1983 if they facilitated, created or increased the danger posed by a private citizen.  <u>See</u> <u>Brown-Alleyne</u>, 1999 U.S. Dist. LEXIS 18511 at *6.

This exception to <u>DeShaney</u> was first laid out in <u>Dwares v. New York</u>, in which plaintiff alleged that police conspired with "skinheads," assuring them that they would not interfere if the skinheads chose to assault a group of protesters. The district court dismissed the complaint under <u>DeShaney</u>. The Second Circuit reversed, however, in light of plaintiff's allegation that the police had agreed to allow the attack, and told the skinheads in advance that they would not be stopped or arrested if they assaulted the protestors.  "Such a prearranged official sanction of privately inflicted injury would surely have violated the victim's rights under the Due Process Clause." <u>Dwares</u>, 985 F.2d at 99; <u>see also</u> <u>Freeman v. Ferguson</u>, 911 F.2d 52, 54-55 (8th Cir. 1990).  As

25

later courts have underscored, "[P]olice officers *do* have a duty to assist victims whom they have endangered through their own conduct." Brown-Alleyne, 1999 U.S. Dist. LEXIS 18511 at *7-8 (emphasis added).

The Second Circuit distinguishes this "state-created danger" theory  from the theory of liability rejected by the Supreme Court in DeShaney because the former goes "well beyond allegations that the defendant officers merely stood by and did nothing."[1] Dwares, 985 F.2d at 99. Additionally, under the Second Circuit's reasoning, this type of liability is not predicated on any special relationship between the victim and the state. See Ying Jing Gan v. City of New York, 996 F.2d 522, 533 (2d Cir. 1993). Rather it arises from a relationship between the state and the private assailant in which the state actively facilitates the private harm.

In Hemphill v. Schott, 141 F.3d 412 (2d Cir. 1998), for instance, the Second Circuit concluded that the Due Process Clause could be violated when officers who were called to the scene of a drugstore robbery allowed the store's manager to join them in pursuit of the suspect and then returned a gun to the manager, who used it to shoot the plaintiff. Id. at 418-20. In Benzman et al. v. Whitman et al., 2006 U.S. Dist. LEXIS 4005, the court found that the Administrator of the EPA took affirmative actions that increased the danger to plaintiff residents, students and workers within the meaning of Dwares, when she made deliberate and misleading statements to the press in which she reassured the public that the air was safe to breathe around Lower Manhattan and Brooklyn in the aftermath of September 11, 2001, and that there would be no risk to those returning to the areas. Id. at *57-62.

---

[1] The procedural posture of Dwares was a Rule 12(b)(6) motion predicated entirely on DeShaney. The court does not know whether plaintiff was able to adduce any evidence to support his theory.

The <u>Dwares</u> "state-created danger" exception to <u>DeShaney</u> was extended from explicit to implicit facilitation in <u>Pena v. DePrisco</u>, 432 F.3d 98, 111 (2d Cir. 2005), where the Second Circuit ruled that a public official could be liable under § 1983 for encouraging the violation of another's rights, even without making an explicit promise to look the other way. In <u>Pena</u>, the Circuit held, "When... state officials communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct... those officials can be held liable under § 1983.... even though none of the defendants are alleged to have communicated the approval explicitly." <u>Id.</u> On a pre-answer motion, the Circuit ruled that <u>Dwares</u>-type § 1983 liability could attach to off-duty police officers who (allegedly) had *implicitly* assured one of their own that he could drink and drive with impunity. The Circuit concluded, however, that this type of implicit liability was not so clearly established as to bar dismissal on the ground of qualified immunity. <u>Pena</u>, 432 F.3d at 114-15.

As the Second Circuit recognized in <u>Pena</u>, the line between "passive" failure to prevent harm and "active" facilitation can be a nebulous one. After all, any time that a police officer stands by passively in the face of impending private harm, a claim can be made that his inaction increased the victim's vulnerability and encouraged the criminal act. Yet such allegations will not suffice to clear the bar set by <u>DeShaney</u>; to be actionable under the "state-created danger" theory, police conduct must rise to the level of explicit or implicit official sanction.

The Supreme Court's decision in <u>DeShaney</u> presents an insurmountable obstacle to any plaintiff alleging a Due Process violation who presents nothing more than ongoing police inaction in the face of imminent private harm. To succeed under the state-created danger theory, a plaintiff must show some contact between the defendant police officers and the private

wrongdoer through which explicit or implicit sanction was communicated. If the mere failure to arrest upon receiving complaints were enough to trigger the doctrine, "poor Joshua," as Justice Blackmun called him, would have had his day in court.

     With these legal standards in mind, the question before this Court, on defendants' motion for summary judgment, is whether the evidence presented by plaintiff raises a genuine issue of material fact that will survive DeShaney.

     Viewed in the light most favorable to the plaintiff, the evidence shows that she complained repeatedly about domestic violence over a fifteen-month period, and that moving defendants repeatedly treated her with indifference or disdain, failed to advise her of her rights as a domestic violence victim or even to characterize the incidents as domestic violence. If plaintiff is to be believed, the defendants pointedly refused to entertain or investigate her complaints, question or arrest her alleged abuser, or enforce an existing order of protection against him. They even declined to characterize her complaints as "domestic violence." From this prolonged course of conduct, as well as the smattering of contacts described above, between some of the individual defendants and Sears, plaintiff claims reasonable jurors could infer that defendants either implicitly or explicitly facilitated Sears' ongoing abuse.

     I disagree that a reasonable jury could find a Dwares-type explicit facilitation violation on the most plaintiff-favorable view of the facts of this case.

     In Dwares itself, plaintiffs alleged that defendant police officers explicitly told a violent group of skinheads that the police would not interfere with their assaults nor arrest them if the skinheads attacked any of the flag burners at a protest rally. 985 F.2d 94 at 97. Recently, this court denied a motion for summary judgment on a Dwares claim based on plaintiffs' evidence

that the defendant police officer had a five-minute conversation with the private assailant immediately preceding the attack, and then stood by ignoring repeated calls for help as the attack took place. <u>Garcia v. Brown</u>, ____ F.Supp. ____, *7 (S.D.N.Y. 2006)(McMahon, J.).  This court concluded that the plaintiff's testimony about seeing this five minute encounter (which the officer emphatically denied), coupled with the testimony of eyewitnesses that the officer stood by and did nothing to stop the attack (also denied), was sufficient to require a jury to decide whether the officer had actively facilitated the attack by assuring the attacker that she could act with impunity. <u>Id</u>.

In this case, there is no analogous evidence. The evidence viewed most favorably to the plaintiff fails to support her allegation that "significant personal relationships" existed between Sears and the defendants, or that the defendants felt financially beholden to Sears on account of his contributions to the Police Benevolent Associations or the respective police departments. (Cplt. ¶22.) Plaintiff's evidence does not even come close to showing the type of explicit contact between Sears and the defendants that would be required to establish a <u>Dwares</u> violation. At most, the evidence shows that some of the individual defendants had heard of Sears, were dimly aware of a contribution he had made in the past, or had sporadic encounters with him that were exceedingly brief and casual. To infer from these isolated and chance encounters that any of the individual defendants, or their respective police departments as a whole, communicated to Sears that he could abuse Okin with impunity would require a leap of faith on the jury's part that could only be termed unreasonable.

Moreover, the plaintiff's emphasis on defendants' "affirmative assurances" that they would provide her with protection undercuts her argument that defendants actively facilitated

29

Sears's abuse by communicating to him that he could act with impunity. (Pl. Br. at 13). To the extent that the plaintiff is attempting to show that defendants' assurances created a "special relationship" and a concomitant duty to protect her under the second exception to <u>DeShaney</u>, her claim fails as a matter of law. 489 U.S. at 198-199. Indeed, in <u>DeShaney</u>, the court foreclosed plaintiff's argument here by holding that an affirmative duty to protect under the special relationship theory arises "not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitations which it has imposed on his freedom to act on his own behalf, through imprisonment, institutionalization, or other similar restraint of personal liberty." 489 U.S. at 189.

As for the implicit facilitation theory adopted by the Court of Appeals in <u>Pena</u>: the facts of this case are in many ways closer to those of <u>Pena</u>, where defendant police officers had implicitly assured one of their own that he could drink and drive with impunity, through a culture in which police officers were "encouraged to inappropriately drink alcohol while on and off-duty," and supervising officers routinely promoted such behavior and participated in it. <u>Pena</u>, 432 F.3d at 111. But plaintiff cannot rely on <u>Pena</u> because the events in suit preceded the <u>Pena</u> decision by over two years. For that reason, the individual defendants here – just like the individual defendants in <u>Pena</u> – would be entitled to qualified immunity, even if they implicitly facilitated Sears' abuse by not arresting him or closing out Okin's numerous complaints almost as soon as they were opened.

This court does not minimize what the evidence, viewed most favorably to the plaintiff, shows: a number of occasions on which individual defendants' behavior toward Okin was highly unprofessional. For example, she testified that, during the December 23, 2001 incident, Douglas

and Manion not only refused to entertain her complaints of abuse, but also proceeded to discuss sports with Sears instead. But the officers' banter with Sears is still a far cry from the kind of explicit authorization defendants were alleged to have provided in <u>Dwares</u>. A reasonable jury could indeed find that such irresponsible and insulting behavior contributed to Sears' subjective sense of power over the plaintiff. But that is true of any instance in which police officers refuse to take a victim's complaint seriously – which is precisely what was held not to violate the Due Process Clause in <u>DeShaney</u>.

For the reasons set forth above, defendants' motion for summary judgment dismissing plaintiff's Due Process claim is granted.

2. *The Motion for Summary Judgment on the 42 U.S.C. § 1983 Claim for Violation of the Right to Equal Protection Under the Fourteenth Amendment is Granted as to All Moving Defendants.*

The plaintiff claims that, by failing to "equally apply the law on the basis of her gender, to take and investigate her complaints against Sears, to accurately report plaintiff's complaints and to provide her reasonable police protections, defendants, both individually and collectively, violated plaintiff's rights to equal protection of the laws" Further, she contends that "defendants refused to arrest defendant Sears because they valued him, as a male, more than they valued plaintiff Okin, a female." (Pl. Br at 14.) Moving defendants respond that plaintiff has failed either to show that they have a practice or policy that affords less protection to victims of domestic violence than to other victims of violence in comparable circumstances or to provide any evidence of gender discrimination.

Although <u>DeShaney</u> held that there is no affirmative right to police protection from private harm, it acknowledged that "[t]he State may not . . . selectively deny its protective

services to certain disfavored minorities without violating the Equal Protection Clause." 489

U.S. at 197 n.3.  But a plaintiff in an equal protection action has the burden of demonstrating

discriminatory intent on the part of the state actor. Village of Arlington Heights v. Metropolitan

Housing Dev. Corp., 429 U.S. 252, 265 (1977); Washington v. Davis, 426 U.S. 229, 241-42

(1976). It is not necessary to demonstrate that the challenged action was taken solely for

discriminatory purposes; it is necessary only to prove that a discriminatory purpose was a

motivating factor. Village of Arlington Heights, 429 U.S. at 265 (discussing Washington v.

Davis).

        The Supreme Court has further refined its definition of a discriminatory purpose as being

"more than intent as volition or intent as awareness of consequences . . . It implies that the

decisionmaker . . . selected or reaffirmed a course of action at least in part 'because of,' not

merely 'in spite of' its adverse effects upon an identifiable group." Personnel Administrator v.

Feeney, 442 U.S. 256, 279 (1979).

        In Eagleston v. Guido, 41 F.3d. 865, 878 (2d Cir. 1994), the Second Circuit announced

the standard that governs equal protection claims in the domestic violence context, instructing

that "a directed verdict is appropriate in a domestic violence equal protection claim unless the

plaintiff adduces evidence sufficient to sustain the inference that there is a policy or a practice of

affording less protection to victims of domestic violence than to other victims of violence in

comparable circumstances, that discrimination against one sex was a motivating factor, and that

the policy or practice was the proximate cause of plaintiff's injury." To survive a motion for

summary judgment, plaintiff must therefore raise a genuine issue of material fact with respect to

each of the three prongs set out in Eagleston.

Plaintiff's argument that Eagleston is no longer good law in light of subsequent changes to *New York* law misses the mark. (Pl. Br. at 18).  Eagleston remains the controlling standard in the Second Circuit for determining when and under what circumstances deviation from stated domestic violence policies gives rise to an equal protection claim. Indeed, several other Circuits that have confronted equal protection claims in the domestic violence context have adopted the same standard. See, e.g. Watson v. City of Kansas City, 857 F.2d 690 (10th Cir. 1988); Ricketts v. City of Columbia, 36 F.3d 775 (8th Cir. 1994); Navarro v. Block, 72 F.3d 712 (9th Cir. 1995); Brown v. Grabowski, 922 F.2d 1097 (3d Cir. 1990); McKee v. City of Rockwall, 877 F.2d 409 (5th Cir. 1989). At least one circuit did so against the backdrop of "one of the nation's most comprehensive domestic violence laws," which – like New York's Family Protection and Domestic Violence Intervention Act of 1994 (L. 1994, ch. 222) – promulgates a mandatory arrest policy in domestic violence cases. Soto v. Flores, 103 F.3d 1056, 1060 (1st Cir. 1997).[2] Therefore, unless and until the Second Circuit disclaims its own precedent, I must follow Eagleston.

At this summary judgment stage, the plaintiff cannot rely on conclusory allegations of discrimination but must adduce evidence that raises a triable issue of fact. With respect to the defendant Town officers, plaintiff has clearly failed to do so.

Of the fourteen incidents alleged in the original complaint, Town officers are implicated

---

[2]To the extent that any of the defendants may have violated New York state law in their handling of Okin's complaints, such violations cannot form the basis of a § 1983 claim, which only supports causes of action based on violations of *federal* statutory law or constitutional rights. See Philadelphia Police and Fire Association for Handicapped Children, Inc. v. City of Philadelphia, 874 F.2d 156, 166-68 (3d Cir. 1989). Plaintiff was free to allege state statutory violations here or in the State Supreme Court; she has not done so.

only in the two that occurred on December 23, 2001 and March 13, 2003. At her examination before trial, Okin described additional incidents, not mentioned in the complaint, at which Town police officers were present: April 12, 2002, June 3, 2002, November 2, 2002, and November 15, 2002. During four of those incidents, however, Town police officers were dispatched in a back-up capacity to Village police officers. Williams testified without contradiction that he is aware of no incident, in the ten or eleven years that he had been a member of the Village Police Department, where a Town officer made an arrest in the Village when a Village officer was present on a Village call. (Williams Dep. at 127-28.) In fact, it is undisputed that when a call originates in the Village and a Village officer responds along with a Town officer in a back-up capacity, the Village officer prepares all of the necessary police incident reports and is responsible for conducting any follow-up investigation. There is thus no indication that the Town police officers responded any differently to Okin's complaints of domestic violence than they would to any other complaint of criminal activity taking place within the confines of the separately incorporated Village.

The two remaining contacts that Okin had with the Town police do not support an inference that the Town had a policy of failing to respond to domestic violence complaints in the same manner as other complaints, or that there was anything gender based about the Town's response. Indeed, the first incident of November 15, 2002 did not involve a specific complaint of domestic violence. Rather, plaintiff had a conversation with Chief O'Dell at the Cornwall Town Clerk's office about obtaining an order of protection against Sears, during which she explained "what the village police weren't doing and were doing and Mr. O'Dell promised [her] that it would never happen on his watch . . . ." (Okin Dep at 628).

The second incident occurred on March 13, 2003, when Okin went to the Town police station, showed Manion her order of protection against Sears, and complained to him that Sears had threatened her in the Town of Cornwall Justice Court. Manion told Okin that Sears would not be arrested that night, but rather that an investigation would have to be conducted to determine if an arrest was warranted. It is undisputed that, the following day, O'Dell followed up with Okin, and then investigated her complaint by speaking with Lynn Tucci, Clerk of the Town of Cornwall Justice Court. When Tucci advised O'Dell that she had not witnessed Sears threaten anyone in court, no arrest was made.[3]

The foregoing review of defendant Town police officers' interactions with plaintiff over the fifteenth-month period at issue in this lawsuit reveals no evidence that the Town officers, individually or collectively, repeatedly or under any circumstance refused to follow the Town's own policies by, *inter alia,* failing to prepare police incident reports and domestic incident reports or failing to conduct follow-up investigation, as plaintiff has argued. (Pl. Br. at 21.) Viewed in the light most favorable to the plaintiff, the evidence raises no genuine issue of material fact with respect to Okin's § 1983 equal protection claim against the defendant Town officers, and their motion for summary judgment on this claim is granted.

In light of plaintiff's more extensive contact with the Village Police Department, her § 1983 equal protection claim against the Village police officers requires more extensive discussion. But it too ultimately fails to raise a material genuine issue of fact for trial.

Ordinarily, a plaintiff must point to facts from cases other than her own to support an

---

[3] This incident involved a verbal threat allegedly made in a public place, not any actual physical violence.

allegation of a policy on the part of a municipality. See e.g. Appletree v. City of Hartford, 555

F.Supp. 224, 228 (D. Conn. 1983). Okin invokes Thurman v. City of Torrington, 595

F.Supp.1521, 1530 (D. Conn. 1984), to show that deliberate indifference to a plaintiff's domestic

violence complaints over an eight month period can *on its own* raise an inference of such a

custom or policy. But Thurman was decided before DeShaney (and before Eagleston),  and it was

grounded on the now discredited theory of an affirmative police duty to protect. In discussing the

implications of Thurman for an equal protection claim post-DeShaney, the Tenth Circuit noted,

"We doubt whether evidence of deliberate indifference in the plaintiff's case alone would be

sufficient evidence of *different* treatment." Watson, 857 F.2d at 696. And in Eagleston, the

Second Circuit squarely held that a domestic violence plaintiff would have to adduce some

evidence that officers responded differently to other types of complaints in order to prevail on an

equal protection claim. 41 F.3d. at 878.

     This plaintiff has failed to do. She relies exclusive on her own story – which, while heart-

rending, does not get her where Eagleston says she must go.

     Plaintiff asks this court to relieve her of the Eagleston evidentiary burden by radically

extending the holding of Petrosino v. Bell Atlantic, 385 F.3d 210 (2d Cir. 2004). In that case, the

court found evidence sufficient to support the female employee's Title VII claim of a sexually

discriminatory hostile work environment, even though both men and women were exposed to

offensive material on the job. The fact that men saw the offensive material as well did  not mean,

Judge Raggi held, that "as a matter of law, their work conditions are necessarily equally harsh."

Id. at 221. In concluding that there was a differential impact on women, the court considered the

objective hostility of the work environment under the totality of the circumstances, and assessed it

in light of "the social context in which particular behavior occurs and is experienced by its target."Id. (quoting Oncale v. Sundowner Offshore Servs., Inc. 523 U.S 75, 81 (1998)).Viewing the evidence presented in this light, the court held that a reasonable trier-of-fact could conclude that the work environment to which plaintiff was exposed was especially demeaning to women.

Okin argues, "by analogy," that even if defendants failed to enforce domestic violence laws and policies against both men and women, "This would be legally irrelevant in assessing a gender bias claim arising from the failure to enforce such laws." (Pl. Br. at 20.) But plaintiff's creative gloss on Petrosino is untenable.

First, as a more thorough analysis of Petrosino demonstrates, the factual differences between the records in the two cases are insurmountable. In support of her hostile work environment claim, the plaintiff in Petrosino adduced evidence demonstrating that her work environment at the Edgewater Garage "was more reminiscent of a locker room than a place of business." Id. at 214. In addition to the profanity and crude humor that permeated the workplace, plaintiff was subjected to sexually demeaning conversations that conveyed a profound disrespect for women. Id. For example, male workers would insult each other by making vulgar claims about their imagined sexual exploitation of each other's wives. Id. n.3. In addition, the plaintiff was constantly exposed to crude sexual graffiti scrawled by co-workers inside terminal boxes, including imagines of "headless women with their legs in the air, women's legs wide open, men with their penises out, and men having sex with animals." Id.

In addition, a few months after she began working at Bell Atlantic, Petrosino herself was physically attacked from behind by a coworker who groped and kissed her – an incident that soon became a "big joke" at the garage and the subject of terminal-box graffiti. Id. at 215. In the

ensuing years, frequent disparaging remarks were made about Petrosino's "ass," her "tits," her menstrual cycle, her weight, and her eating habits, and at least one terminal-box drawing depicted her performing a sex act on a supervisor.

Nor were these remarks restricted to private exchanges. They extended to her professional demeanor and the quality of her work. One of Petrosino's supervisors punctuated his conversations with her with hostile gender-based comments, referring to her as "a damn women," telling her to cam her "big tits down," and dismissing her job concerns as attributable to her menstrual cycle. Id.

Petrosino's evidence that her work environment was hostile to women was not limited to the instances described above, but the preceding recital should suffice to convey the level of offense and humiliation at issue. In assessing the plaintiff's hostile work environment claim, Judge Raggi considered both the totality of the circumstances and the social context in which the events transpired. Id. at 221. She wrote that, while Petrosino's co-workers may have sexually ridiculed both men and women, the insults directed at men were "directed at certain men, not men as a group." Id. This is in stark contrast, she found, to the "uniformly sexually demeaning" depiction of women in the offensive jokes and graphics, which "communicated the message that women as a group were available for sexual exploitation by men." Id. In sum, the Second Circuit reversed the district court's grant of summary judgment on the hostile work environment claim because a reasonable jury could conclude that the work environment at Edgewater Garage was more demeaning to women than men.

Plaintiff essentially argues that the disproportionately demeaning impact of the sexually offensive workplace environment in Petrosino is analogous to the purported discriminatory

impact on women of Village police officers' failure to adequately enforce domestic violence laws and policies in her case. Okin has come nowhere close to making the sort of showing that Petrosino made. Plaintiff testified that Douglas discussed sports with Sears while responding to one of her calls, and that Weber made a number of comments to the plaintiff, and notes about her in his incident reports, that betrayed impatience, irritation and even contempt. Assuming all this to be true, none of what plaintiff described contained any gender-based references – not even sufficiently to be "ambiguous" on the point. See e.g. National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 743 (1st Cir. 1995). Failing as they do to give any indication of the Village officers' views about women as a group–or about domestic violence complaints as a class–they fail to give rise to an inference of gender discrimination on the part of defendant officers.

Aside from her own case, plaintiff has not provided a shred of statistical, documentary, or even anecdotal evidence tending to establish that the Village police officers treated domestic violence complaints differently than other types of complaints. The only comparison she attempts to draw between her own case and another is the purported diligence with which Williams investigated Sears allegation that plaintiff had stolen money from him on February 8, 2002. Even putting aside the legitimacy of the grounds for Williams' investigation – plaintiff admitted that she did take $105,000 from Sears but claimed to have done with his permission – it would be unreasonable, based on this single incident, to draw the inference that the Village police officers, individually or collectively, had a practice of not paying attention to domestic violence complaints made by women.

Nor has plaintiff adduced any evidence to tie such differential treatment, if shown, to the kind of disproportionate impact on women the plaintiff clearly demonstrated in Petrosino.

Plaintiff asserts, without offering any evidence, that women report "the vast bulk of domestic violence incidents" and that by failing to enforce domestic violence laws "defendants directly and adversely affect women in a disproportionate manner." At the summary judgment stage, those conclusory allegations  will not suffice.[4]

Finally, even if plaintiff's Petrosino analogy established that failing to respond properly to domestic violence claims has a disparate impact on women, this would only get plaintiff to the "starting point" of her equal protection claim. Eagleston, 41 F.3d at 878. Whereas the Title VII hostile work environment claim the plaintiff made in Petrosino survived on a showing of discriminatory impact, an Equal Protection claim requires discriminatory intent. Arlington Heights, 429 U.S. at 265. And  the latter cannot simply be inferred from the former. In the landmark Feeney decision, the plaintiff challenged a veteran's preference policy that favored men at a rate of ninety-eight percent. 442 U.S. at 270. Notwithstanding this overwhelming adverse impact on women, the Supreme Court rejected the plaintiff's gender-based discrimination claim, because she had not shown that the classification was adopted to purposefully discriminate against women. Id. At 278-78.

Nor can this case be compared to Soto, where high-ranking members of the police

---

[4] Plaintiff could no doubt have introduced evidence that would have supported her contentions. Instead she is, in effect, asking me to take judicial notice of these matters. Under Fed. R. Evid. 201(b), this court may take judicial notice of a fact "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Plaintiff's contention that the majority of domestic violence complaints are made by women is likely to fall into the first category and virtually certain to fall into the second. Yet the inference plaintiff urges this court to draw– that the Village police's failure to enforce domestic violence laws adversely affects women (not just plaintiff) in a disproportionate manner–depends for its validity on evidence plaintiff has not submitted.

department openly proclaimed their hostility to enforcing the domestic violence law, using language that betrayed archaic stereotypes of women. Testimony also showed that domestic violence complaints as a whole–not just plaintiff's complaints–were "not given great importance" during the relevant period. 103 F.3d at 1071. On that record, there was enough evidence to permit a reasonable trier of fact to conclude that the failure to enforce domestic violence laws at the precinct-level was based on gender discrimination.[5] Unfortunately for plaintiff,  no similar evidence has been adduced here.

Because of this utter failure of proof under the Eagleston standard, the Village officers' motion for summary judgment on plaintiff's § 1983 equal protection claim is granted.

*3. Plaintiff's § 1983 Municipal Liability Claim is Dismissed*

The heart of plaintiff's equal protection claim appears to be that "both departments have adopted discriminatory practices and customs for which they may be held liable." (Pl. Br. at 15.) In Monell v. Dept. of Social Services, 436 U.S. 658, 691 (1978), the Supreme Court held that municipalities may be held liable under 42 U.S.C. § 1983 when "action pursuant to official municipal policy of some nature caused a constitutional tort." The Court made clear that outside the realm of official policy, a municipality may be sued for "constitutional deprivations visited pursuant to governmental 'custom' even though such custom has not received formal approval through the [governmental] body's official decisionmaking channels." Id. at 690-91; see also Pembaur v. City of Cincinnati, 475 U.S. 469, 481-82 n.10 (1986).

---

[5]It bears noting that–despite the significant evidence of precinct-wide gender discrimination–the Soto court nevertheless concluded that there was insufficient evidence that the two defendants in plaintiff's own case were motivated by a discriminatory intent. 103 F.3d 1070-72.

Here the plaintiff acknowledges that both departments are governed by state laws and written domestic violence policies at the municipal level that are adequate on their face, but claims that the moving defendants' response to her complaints demonstrates an unofficial policy or custom of violating the written policy in a discriminatory manner.

Alternatively, plaintiff seeks to predicate municipal liability under § 1983 on the alleged failure of the Village and Town Police Departments, as well as Chiefs O'Dell and Williams, to ensure that their police officers were adequately trained in the implementation of domestic violence laws and policies.

To proceed on a municipal liability theory under Monell, the plaintiff must show that an official policy or custom existed, which caused her to be subjected to the denial of a constitutional right.  436 U.S. at 678. In Los Angeles v. Heller, 475 U.S. 796 (1986), the Supreme Court made clear that some violation of the plaintiff's constitutional rights is the *sine qua non* of municipal liability. "If a person has suffered no constitutional injury at the hands of the individual police officer," the fact that municipal policy might have resulted in a constitutional violation is "quite beside the point." Id. at 799. See also Santiago v. New York, 1992 U.S. Dist LEXIS 6731 (S.D.N.Y. 1992). Since, plaintiff has failed to raise a genuine issue of material fact on her equal protection claim against defendant Town and Village police officers, there is no underlying constitutional violation on which to predicate municipal liability.

The same is true of plaintiff's alternative ground for municipal liability: the failure on the part of the Town and the Village to adequately train their police officers in the area of domestic violence.  In City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989), the Supreme Court held that a municipality may, under certain circumstances, be held liable under § 1983 for

individual officers' sketchy recollection and understanding of domestic violence laws and policies, together with their pattern of not taking Okin's repeated complaints seriously, at the very least raises an issue of fact concerning the adequacy of the training provided by the two Departments to their officers. Were this court the trier of fact, I might well conclude that it sufficed to demonstrate an abysmal failure to train.

But plaintiff did not bring a negligent failure to train claim under state law. She asserted a claim under § 1983. Had she raised a genuine issue of fact concerning either her due process or her equal protection claims,  this court would have sent her failure to train claim to the jury, too. However, since the plaintiff failed to meet her burden on a summary judgment motion, this federal claim against the Village and Town must be dismissed.

## Conclusion

Defendants' motion for summary judgment dismissing all federal claims asserted against them is granted. The Clerk is directed to close the file.

This constitutes the decision and order of the Court.

Dated: October 13, 2006

_____
U.S.D.J.

BY FAX TO ALL COUNSEL

43